NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1311

E. MARK NOONAN

vs.

CBW LENDING, LLC.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, E. Mark Noonan, filed a complaint in the Superior Court against the defendant, CBW Lending, LLC (CBW Lending), alleging breaches of a promissory note, a mortgage, and a prior settlement agreement between the parties.  After a hearing on cross motions for summary judgment, the judge issued an order granting summary judgment to the defendant.  The plaintiff appealed from the decision, which was later entered as a final judgment.[1]  We find that the defendant committed a breach

---

[1] Although the plaintiff's notice of appeal preceded the entry of final judgment, this appeal encompasses the final judgment, where the order from which the plaintiff noticed his appeal "adjudicated all remaining claims."  Mass. R. A. P. 3 (c) (1) (D), as appearing in 491 Mass. 1601 (2023).

of the "Capital Event" provision of the promissory note, and that that was an event of default under § 21 (e) of the mortgage, and hence we reverse.

Background. We summarize the undisputed facts. On September 12, 2005, Wonderland Greyhound Park Realty, LLC (WGPR), entered into two mortgages. The first mortgage, with Anglo Irish Bank Corporation Limited (Anglo Irish Bank), was in the amount of $8.82 million, and the second mortgage (Noonan mortgage), with the plaintiff, was in the amount of $3,929,000. Both mortgages were secured by the Wonderland Greyhound Park property (property) at 190 VFW Parkway in Revere. Wonderland Greyhound Park was a racetrack for parimutuel[2] greyhound racing, that is, greyhound racing upon which patrons could bet. On January 1, 2010, following passage of a popular referendum, parimutuel dog racing was banned in Massachusetts. On the same date as it entered into the Noonan mortgage, WGPR signed a promissory note to Noonan labelled "Second Mortgage Note" (Noonan note). The mortgage with Anglo Irish Bank took first priority over the Noonan mortgage. In February 2010, the defendant, CBW Lending, purchased the first mortgage from Anglo Irish Bank (CBW mortgage). CBW Lending was an affiliate of

---

[2] Parimutuel betting is a wagering system where all bets are pooled and winners share the total pool.

2

Suffolk Sterling Racecourse, LLC, the owner of Suffolk Downs,

then a horse racing track in East Boston.[3]

The Noonan mortgage includes the following relevant

provisions:

"The Mortgagor hereby covenants and agrees . . .

"1. to perform all of the covenants and agreements in the
Note; . . .

"4. to fully and timely comply with all representations,
warranties and covenants of the First Mortgage; . . .

"13. to notify the Mortgagee promptly of the existence of
and the exact details of any other security interest in the
Premises . . . ;

"16. [t]hat the Mortgagor shall not:

"(a) create or permit to be created any encumbrance to
attach to the Premises . . . and if such encumbrance is
attached upon the Premises without the consent of the
Mortgagor, to discharge the same within thirty (30) days of
the date of such attachment; . . .

"17. if this Mortgage is at any time subject or subordinate
to another mortgage, the Mortgagor shall not modify, amend,
or extend such prior mortgage, or the debt or other
obligation secured thereby, without the consent of the
Mortgagee; any default under said prior mortgage or the
obligations secured thereby shall be a default hereunder,
and the Mortgagee shall be entitled but not obligated to
cure said default, as provided in Paragraph 14 hereof; and
. . .

"21. . . . [t]he occurrence of any one or more of the
following events (each an "Event of Default") shall

_____

[3] CBW Lending is a limited liability company that has a single member, Coastal Belmont, LLC. Coastal Belmont, LLC, had three members, all owners of Suffolk Downs, through August 7, 2018. Two of them, not including the principal owner of Suffolk Downs, remained members thereafter.

3

constitute a default under and breach of this Mortgage:
. . .

"(e) failure to observe or perform any covenant, agreement, condition, term or provision of any of the restrictions, covenants and conditions set forth or referred to in any of the Security Documents other than this Mortgage; or . . .

"(g) failure to observe or perform any covenant, agreement, condition, term or provision of this Mortgage, and such failure shall continue without having been duly cured for a period of 10 days after written notice thereof given by the Mortgagee to the Mortgagor . . . .

"Upon the occurrence of any Event of Default, Mortgagee may at any time thereafter, at its option and without notice, exercise any or all of the following rights and remedies:

"(a) declare the entire debt secured hereby due and payable, and such debt shall thereupon become and be immediately due and payable . . . ."

Meanwhile, the Noonan note includes a provision (capital

event provision) that reads

"Notwithstanding anything set forth herein to the contrary, the Borrower shall be required to make prepayments to Lender of the then-outstanding principal and accrued interest under this Note upon the occurrence of a Capital Event, as defined below (in each case, a 'Mandatory Prepayment').  For the purposes of this Note, a 'Capital Event' shall mean any of . . . (ii) any equity financing, debt financing or combination thereof by either the Borrower [WGPR] or Westwood [its parent company] which generates in excess of EIGHT MILLION EIGHT HUNDRED AND TWENTY THOUSAND and 00/100ths DOLLARS ($8,820,000.00).  The amount of any such Mandatory Prepayment shall equal the aggregate amount of capital generated by a Capital Event, after deduction of all of the Borrower's reasonable fees and expenses occurred in connection therewith, and shall be payable to Lender concurrently with the closing on the relative Capital Event."

4

In December 2008, the plaintiff filed a suit against numerous parties, including WGPR and Anglo Irish Bank, after discovering, among other issues, further borrowing by WGPR from the Anglo Irish Bank of $1 million and a concomitant agreed-upon increase in the principal amount of the first mortgage to $9.82 million. He argued that, by accruing the additional $1 million debt without obtaining his consent or making any mandatory prepayment, WGPR violated §§ 16 and 17 of the Noonan mortgage and the capital event provision of the Noonan note. After CBW Lending purchased the first mortgage from Anglo Irish Bank in 2010, the plaintiff amended the complaint to include claims against CBW Lending, alleging a breach of the covenant of good faith and fair dealing.

In May 2011, the parties to that action, including Noonan, CBW Lending, WSGR, and Anglo Irish Bank, executed a "binding and enforceable" settlement agreement that contained all the "material terms" of the settlement. Under the settlement agreement, the CBW mortgage and Noonan mortgage were both given first priority. Noonan agreed to forego any further interest accrual, and to limit his recourse to the property only. The settlement agreement fixed the CBW mortgage debt at $9.82 million and the Noonan mortgage debt at $8.8 million, and said "The CBW and Noonan promissory notes and mortgages shall be

amended in accordance with the terms of the definitive agreement."[4]

The settlement agreement provided for a payment of $2 million to Noonan upon his execution of the agreement. It provided that CBW Lending and Noonan were to "share 50/50 in the proceeds of any subsequent disposition of the Wonderland Property," up to a total payment of $6.8 million to Noonan, and that Noonan would discharge his mortgage for his half of the proceeds, even if that was less than $6.8 million. CBW Lending and Noonan agreed not to foreclose on the property without mutual consent.

The settlement agreement was subsequently supplemented with a release agreement in August 2011, after the parties failed to agree on the terms of a definitive agreement. The release agreement states

> "1. <u>Settlement Agreement</u>. The Settlement Agreement . . . together with the CBW Note, the Noonan Note, the CBW Mortgage, and the Noonan Mortgage (all as they have been amended by the Settlement Agreement), governs the rights and obligations of the Parties with respect to the matters set forth therein . . . . Nothing contained in this Release Agreement shall release or modify the rights and obligations set forth in the Settlement Agreement or in the CBW Note, the

---

[4] Section 7 of the settlement agreement specifies that "Parties shall work together in good faith to finalize the definitive agreement memorializing these material terms . . . ." However, the parties were unable to agree on certain specific terms and failed to reach a definitive agreement.

6

Noonan Note, the CBW Mortgage or the Noonan Mortgage as amended by the Settlement Agreement."[5]

In March 2012, after the ban on greyhound racing went into effect, a quitclaim deed granted CBW Lending title to the property, while the CBW mortgage remained "in full force and effect and separate and distinct."

In 2017, the city of Revere ordered CBW to demolish the grandstands at the property. Two of the three members of Coastal Belmont, LLC, the sole member of CBW Lending, formed VNO Belmont Wonderland LLC (VNO) to loan CBW Lending the money for demolition. CBW Lending, now the owner of the property and thus the mortgagor in the Noonan mortgage, granted VNO a $5 million mortgage (VNO mortgage) secured by the property. CBW Lending recorded the mortgage but did not notify Noonan, obtain his consent, or otherwise repay the Noonan mortgage. The VNO mortgage was converted to equity in 2019, after the person who had been the third member of Coastal Belmont, LLC, was no longer a member.

In February 2021, the plaintiff discovered the VNO mortgage. He sent e-mail messages asking CBW Lending to provide copies of the VNO mortgage and the accompanying note on February 2, 2021, and called CBW Lending to inquire about the mortgage on

_____

[5] The release agreement elsewhere referenced the fact that no definitive agreement had ever been reached.

7

February 10, 2021. On March 8, 2021, the plaintiff commenced this action against CBW Lending. CBW Lending discharged the VNO mortgage shortly after that, on March 18, 2021. In March 2022, the plaintiff sent a formal written notice of default.

The city of Revere took the property by eminent domain on January 17, 2023. In connection with the taking, the city paid Noonan $6,796,500 on February 17, 2023, paying off the principal of the Noonan debt and some interest accrued between January 17, 2023, and the payment a month later.

The plaintiff alleges several breaches of the Noonan mortgage, including breaches of its § 13, the provision requiring notification of other security interests, and its § 16 (a), the provision prohibiting new encumbrances without the plaintiff's consent. The plaintiff also alleges violation of the capital event provision in the Noonan note, as well as the provision in the first mortgage forbidding the mortgagor to "sell, convey, mortgage, pledge, hypothecate, encumber, lease, assign or otherwise transfer" the property without written consent by the mortgagee.[6] Finally, the plaintiff argues the

_____

[6] After CBW acquired the first mortgage and the title to the property, it became simultaneously the mortgagor and mortgagee of the first mortgage. Noonan argued that by violating the provision in the first mortgage, CBW Lending also violated paragraph 4 of the Noonan note, which required the mortgagor "to fully and timely comply with all representations, warranties and covenants made by Borrower under the First Mortgage."

8

2017 mortgage constituted a "disposition" of the property under the settlement agreement, and that he was entitled to 50% of the proceeds.

On September 22, 2023, the plaintiff filed a motion for summary judgment and the defendant filed its cross motion for summary judgment. The Superior Court judge granted the defendant's cross motion for summary judgment and denied the plaintiff's motion. The judge found that while the defendant accrued new debt funding without notifying the plaintiff, committing a breach of §§ 13 and 16 (a) of the Noonan mortgage, no event of default occurred because the plaintiff failed to give written notice of breach, pursuant to § 21 (g) of the mortgage, before the mortgage was discharged. The judge then reasoned that since the defendant was both the holder of the first mortgage and the owner of the encumbered property, the consent to the 2017 mortgage by the defendant is implicit. For the capital event provision, the judge stated that the unambiguous language of the provision defined a capital event as accruing any debt beyond $8.82 million in addition to the existing encumbrances. Since the fund generated by the 2017 mortgage was below $8.82 million, the judge concluded the capital event provision did not apply. Finally, the judge concluded that the 2017 mortgage was not a "disposition" under

9

the settlement agreement, as a matter of law, nor was this result commercially absurd or otherwise improper.

The plaintiff appeals from the allowance of the defendant's cross motion for summary judgment and the denial of his own motion for summary judgment.

Discussion. Summary judgment may enter when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). We apply a de novo standard of review to decisions on motions for summary judgment. See Business Interiors Floor Covering Business Trust v. Graycor Constr. Co., 494 Mass. 216, 220 (2024). Whether a contract is ambiguous is a question of law that we review de novo. See Bank v. Thermo Elemental, Inc., 451 Mass. 638, 648 (2008). When determining whether the language at issue is ambiguous, we look to both the contested language and the text of the contract as a whole. See Balles v. Babcock Power Inc., 476 Mass. 565, 572 (2017).

We resolve this case on the basis of the capital event provision in the Noonan note and § 21 (e) of the Noonan mortgage, which addresses breaches of the Noonan note. We therefore need not and do not address the other claimed breaches.

10

The capital event provision of the Noonan note states that "For the purposes of this Note, a 'Capital Event' shall mean any of . . . (ii) any equity financing, debt financing or combination thereof by [the Borrower or its parent company] which generates in excess of EIGHT MILLION EIGHT HUNDRED AND TWENTY THOUSAND and 00/100ths DOLLARS ($8,820,000.00)." The capital event provision bound the defendant, CBW Lending, after it acquired the property. "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken'" (citation omitted). Bank, 451 Mass. at 648. The language quoted is ambiguous. It does not say whether it means any financing in excess of that amount in addition to the money being borrowed in exchange for the Noonan mortgage, or any financing in that amount in addition to the total debt incurred that day, i.e., the financing from Anglo Irish Bank and the financing obtained by the Noonan mortgage.

Because it is ambiguous, we may look at extrinsic evidence to determine its meaning. See Wortis v. Trustees of Tufts College, 493 Mass. 648, 663 (2024). On the same date the Noonan note was signed, the property was encumbered by the first mortgage given to Anglo Irish Bank (now the CBW mortgage), which provided debt financing in the amount of $8.82 million.

11

The defendant argues that the provision should be construed, as the judge concluded, to mean that a further mortgage, i.e., further debt financing, is a capital event only if it produces in excess of an additional $8.82 million above the amount borrowed from Anglo Irish Bank and Noonan combined. By contrast, Noonan argues that this is intended to permit the mortgage with Anglo Irish Bank of $8.82 million itself, and no further debt or equity financing after the money from the Noonan mortgage.

It is a "basic rule of construction that we must . . . construe the language to give it reasonable meaning wherever possible."  Shea v. Bay State Gas Co., 383 Mass. 218, 224-225 (2018).  Noonan and WGPR could have agreed to allow further financing beyond what was being borrowed that day, $12,749,000 (Noonan's $3,929,000 and Anglo Irish Bank's $8.82 million), without it being a capital event.  They could have set the cap on such borrowing at any amount -- another $1 million, for example, or $5 million, or $8 million, or $12 million.  But they chose exactly the same amount as that day's borrowing from Anglo Irish Bank.

The defendant has not put forward any commercially explicable reason, under its reading of the provision, for the choice to allow an exact doubling of the amount borrowed from Anglo Irish Bank that day.  The mere fact that it is the amount

12

the borrower wanted or needed that day from Anglo Irish Bank is commercially meaningless with respect to any future borrowing that might be prohibited.

The best reading of the capital event provision, therefore, is that this is (as it appears to be) a reference to the amount slated to be borrowed from Anglo Irish Bank that same day, and that it is a prohibition on any borrowing, in addition to the Noonan mortgage, above that.

The defendant relies on Noonan's deposition testimony to argue that he accepted its preferred definition of a capital event.  At the very end of the then seventy year old plaintiff's four-hour deposition, when asked about his discussions concerning the capital event provision, the plaintiff stated "Well, effectively, this note represents what I've been referring to in the complaint documents as the no new money mortgage loan.· So what [the capital event provision] means is beyond the fully drawn-down at the time Anglo Irish loan, no more than $8.82 million could be borrowed or of -- any form of capital could be raised without prepayments on my note being made."  The defendant says that what Noonan was saying was that $8.82 million more could be borrowed above the $8.82 million borrowed from Anglo Irish Bank.

To begin with, it is not at all clear that is what it means.  Although counsel for the defendant agreed when defense

13

counsel repeated the second sentence and asked if it was the meaning of the capital event provision, Noonan's answer begins by saying that "no new money mortgage" was permitted. He ends by saying that not "any form of capital could be raised without prepayments on my note being made."

But even assuming the defendant's characterization is correct, it may well have been an indication of the plaintiff misunderstanding or misspeaking. Not only did he begin by saying "this note represents what I've been referring to in the complaint documents as the no new money mortgage loan." In the complaint filed by the plaintiff -- indeed in the complaints of both this case and the 2008 case -- the provision is described as prohibiting any new money mortgages beyond the first mortgage at all. And throughout his deposition, the plaintiff testified that the 2017 mortgage rendered his debt due and payable in full. In any event, the extrinsic evidence of what we are assuming was this one inconsistent answer is hardly sufficient to demonstrate that the meaning of the capital event provision is as the defendant claims.

The defendant makes two arguments that there was no violation here even if the capital event provision is construed as we have construed it. The defendant argues first that the capital event provision was replaced by §§ 10-12 of the 2011 settlement agreement. But the sections cited by the defendant

14

merely reset the priorities and amounts of the two mortgages and describe what will happen if and when there is a disposition of the property.  Neither is inconsistent with nor modifies the capital event provision.  The capital event provision was neither superseded nor amended by §§ 10-12 of the settlement agreement -- assuming the settlement agreement worked amendments in the absence of a definitive agreement -- and, like the rest of the Noonan note as amended, it continues to describe the "rights and obligations of the parties."[7]

Next, the defendant argues the plaintiff suffered no injury, because the Noonan debt was eventually paid off by the city of Revere, or that any injury was cured by that repayment and the discharge of the mortgage.  We are not convinced.

The capital event provision accelerated payment of the Noonan debt when the defendant encumbered the property for new debt financing in 2017.  By delaying such payment, the defendant practically withheld funds that would have been available to the defendant for almost four years.  This constitutes the denial of use of his capital, an injury recognized under Massachusetts law.  See G. L. c.  231, § 6C; Salvi v. Suffolk County Sheriff's

_____

[7] The only amendment to the capital event provision that could have been wrought by the settlement agreement, in our opinion, is resetting the debt ceiling in the capital event provision at $9.82 million from $8.82 million, in accordance with § 3 of the settlement agreement, which sets the CBW Lending Debt to $9.82 million.

15

Dep't, 67 Mass. App. Ct. 596, 609 (2006) ("Prejudgment interest, as is well understood, compensates the prevailing party for loss of the use of money [by] that party" [citation omitted]). Nor was this injury cured by merely discharging the mortgage in 2021.

We thus conclude that the defendant owed Noonan the amount borrowed as specified in the Noonan note at the time the defendant issued the VNO mortgage. Of course, the VNO loan was for less than the total value of the debt owed by the defendant to Noonan, but the balance was due under the mortgage itself. Section 21 (e) of the Noonan mortgage provides that "failure to observe or perform any covenant, agreement, condition, term or provision of any of the restrictions, covenants and conditions set forth or referred to in any of the Security Documents other than this Mortgage" is an event of default. The Noonan note is such a "Security Document," under the definition in § 21 (c) of the mortgage. Consequently, the giving of the VNO mortgage without notice to Noonan was also an event of default under the mortgage, making the full amount owed to Noonan under the mortgage due and payable.[8]

---

[8] Noonan has also argued that the VNO mortgage violated §§ 4, 13, and 16 (a) of the mortgage. The defendant argues such violations would not be events of default because of the language of Section 21 (g) of the mortgage, which makes "failure to observe or perform any covenant, agreement, condition, term

16

The judgment is reversed.  The case is remanded for the entry of a new judgment in favor of the plaintiff, including a calculation of damages consistent with this memorandum and order.

> So ordered.
>
> By the Court (Rubin,
>   Brennan & Wood, JJ.[9]),

Clerk

Entered:  July 6, 2026.

---

or provision of this Mortgage" an event of default only if "such failure shall continue without having been duly cured for a period of 10 days after written notice thereof given by the Mortgagee to the Mortgagor."  The defendant avers it received no such notice.

We need not reach the question of whether the VNO mortgage was a breach of one of those terms of the mortgage, because of our conclusion that it was a violation of the capital event provision of the Noonan note.  That is an event of default under § 21 (e), which contains no notice and cure provision.  Our conclusion thus also obviates the need to address the question of the meaning of the notice provision in § 21 (g) in circumstances where there is a breach of an obligation to disclose something to the borrower which might also prevent the borrower from having the knowledge necessary to provide written notice.

The defendant does not argue that any steps beyond an event of default -- for example, if there was a breach of a mortgage provision and the notice and cure provision of § 21 (g) were met -- are required under the mortgage before the amounts described are due and payable.  Any such argument therefore is waived.

[9] The panelists are listed in order of seniority.

17